W.V. Bernie Siebert
SHERMAN & HOWARD L.L.C.
633 Seventeenth Street, Suite 3000
Denver, CO 80202
(303) 299-8222
(303) 298-0940 (fax)
bsiebert@sah.com

Sharon M. Rose
LAVERY & ROSE, P.C.
P.O. Box 890
Evanston, WY 82930
(307) 444-4200
(307) 444-0559 (fax)
srose@evanstonlaw.com

## UNITED STATES DISTRICT COURT
## DISTRICT OF WYOMING

| | |
|---|---|
| PAUL A. MUMBY, ERIC HOLTZCLAW, WILLIAM G. JOHNSON, JOHN PAZEJ, JR., RITTA PEAVLER, JAMES G. RAUCH, JEROME G. RAUCH, DAVID REDDIN, and others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> PURE ENERGY SERVICES (USA), INC., <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) )    CIVIL ACTION NO. 09-CV-77-ABJ |

---

## DEFENDANT'S FINAL PRE-TRIAL MEMORANDUM

---

COMES NOW Pure Energy Services (USA), Inc. and for its Final Pre-Trial

Memorandum, states as follows:

## I.        Nature of the Case

This is a case brought pursuant to the Fair Labor Standards Act, 28 U.S.C. § 201 *et seq.*
The issues concern alleged unpaid overtime compensation based on Defendant paying Plaintiffs
a day rate, attendance at sporadic mandatory meetings and travel time for persons transporting
other employees to and from the work sites and the appropriate period of limitations and whether
Plaintiffs are entitled to liquidated damages.

## II.       Positions of the Parties

1.        Plaintiffs' position:  Plaintiffs claim that they were improperly paid a "day rate"
which did not include overtime.  Plaintiffs rely on this Court's ruling in *Condos et al. v. Pure
Energy Services,* where this Court ruled that Pure Energy Services improperly paid its field
service employees a day rate and that such employees were entitled to unpaid overtime for all
work performed in excess of 40 hours per week.  Plaintiffs further claim that they are entitled to
overtime compensation for the time spent in mandatory employee meetings often held outside an
employee's regular work hours.  Plaintiffs also claim that the drivers of company vehicles that
transported employees to and from their worksites should be compensated for such travel time.
Finally, Plaintiffs claim that they are entitled to the longer three year period of limitations
because the actions of Defendant were willful and that they are also entitled to liquidated
damages (an amount equal to actual damages).

2.        Defendant's position:  Defendant acknowledges this Court's decision in *Condos*
and it applicability to field service employees in this case.  Defendant also acknowledges its
liability to employees who were not compensated for attending mandatory meetings.  Defendant
does not believe it is liable for any compensation for the time spent by some of the Plaintiffs
driving other employees to and from the work site.  Finally, Defendant does not believe that

2

Plaintiffs are entitled to any extension of the statutory two year period of limitations as its action were not willful, but rather done in reliance on advice of competent outside labor counsel. Finally, based on the good faith of Defendant, Plaintiffs are not entitled to liquidated damages.

## III.   Legal Issues

The issues of the day rate and compensation for mandatory meetings are not legal issues that need to be addressed by the Court.  The remaining legal issues are:

(1)   Whether Plaintiffs who drove employees to and from the work sites should be compensated for the activity?  The lead cases are:  *Smith v. Aztec Well Servicing Co.,*  452 F.3d 1274 (10th Cir. 2006); *Crenshaw v. Quarles Drilling Corp.,* 798 F.2d 1345 (10th Cir. 1986).

(2)   The issue of willfulness was decided by the Court.

(3)   Whether Plaintiffs are entitled to liquidated damages?  The statutory authority is 29 U.S.C. § 260.  Some of the lead cases are:  *Huggins v. United States America*, 2005 W.L. 6112625 (Fed. Cl. 2005); *Doty v. Elias*, 733 F.2d 730, 736 (10th Cir. 1984); *Pabst v. Oklahoma Gas & Electric Co.*, 228 F.3d 1128, 1137-38 (10th Cir. 2000); *Roy, et al. v. County of Lexington, South Carolina*, 141 F.3d 533, 458 (4th Cir. 1998); *Featsent et al. the City of Youngstown*, 70 F.3d 900 (6th Cir. 1995); *Lee v. Coahoma County, Mississippi*, 937 F.2d 220 (5th Cir. 1991); *O'Brien v. Town of Agawam*, 482 F. Supp. 2d 115 (D. Mass. 2007); *Rogers v. Savings First Mortgage LLC*, 362 F. Supp. 2d 624 (D. Maryland 2005); *Horan v. King County, Washington, Division of Emergency Medical Services*, 740 F. Supp. 1471 (W.D. Wash. 1990).

## IV.   Factual Issues

Factual issues concern the hours worked by each Plaintiff in each workweek and any claims for hours worked in excess of those shown on payroll records; the amount of time, if any, each Plaintiff spent in mandatory company meetings; the amount of time spent by those

Plaintiffs claiming travel time in transporting other employees to the worksite; what equipment, if any was transported on the trucks taking employees to the worksite; whether the violations were willful; whether Plaintiffs are entitled to liquidated damages; to the extent that Plaintiffs prevail, the amount of attorney fees to be awarded Plaintiffs' counsel.

### V. Undisputed Facts

1.      Plaintiffs seek unpaid overtime compensation and other relief under the provisions of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. §§ 201 *et seq.* ("FLSA").

2.      Plaintiffs are or were employed by Defendant, Pure Energy Services.

3.      Defendant is an oilfield services company that conducts and has conducted oilfield services relating to new or existing natural gas wells, oil wells and related operations in the Rocky Mountain region of the United States. Defendant has field operations situated in Canada and Evanston, Wyoming, and Grand Junction, Colorado.

4.      Plaintiffs worked in the oil field servicing operations of Defendant and were employed by Defendant.

5.      Aside from when they were assigned to work in the shop, Plaintiffs were scheduled to work and normally did work 12-hour shifts in the oil fields, seven days a week.

6.      Up until approximately September 2007, Plaintiffs were compensated at an agreed flat rate for each day worked in the oil fields.

7.      Defendant did not keep accurate records of the actual number of hours worked by Plaintiffs each day or in each workweek.

8.      Plaintiffs were paid the day rate regardless of the number of hours they worked, whether 12 hours, or more than 12 hours, or fewer than 12 hours.

EMPLOY\529127.1

9.      Plaintiffs' pay stubs contained a line for their "day rate" pay.  The line contained the day rate they were paid and the number of days they worked in the pay period.

10.     In workweeks in which Plaintiffs worked over 40 hours in oil fields and were paid by a day rate for each day ticketed to a client, Defendant did not pay Plaintiffs any additional compensation above the day rate set forth in the employment terms.

11.     In *Condos v. Pure Energy Services*, 07-127J (D. Wyo.), the Court ruled that the payment of Defendant's employees by day rate failed to properly compensate those employees for all overtime hours according to the requirements of the FLSA.

12.     Plaintiffs performed in the same job classes as the Plaintiffs in *Condos v. Pure Energy Services*, 07-127J (D. Wyo.) and were each on the list of prospective Plaintiffs produced by Defendant by order of the court in *Condos*.

13.     Defendant is a wholly owned subsidiary of Pure Energy Services, LTD.

14.     Pure Energy Services, LTD is a Canadian corporation incorporated under the Business Corporations Act (Alberta).

15.     Pure Energy Services, LTD, or its predecessor entity or entities, began operations in Canada in 2001.

16.     In October 2004, Pure Energy Services, LTD began operations in the United States through Defendant.

17.     Prior to commencement of operations in the United States, Defendant did not ascertain what the provisions of the Fair Labor Standards Act required with respect to payment of its employees in the United States.

18.     Defendant commenced operations in the United States and employed people in the United States in a manner consistent with how Defendant employed employees in Canada.

19.     After commencement of operations in the United States, Defendant did not ascertain the provisions of the Fair Labor Standards Act with respect to payment of overtime to its employees in the United States until Cindy Rucker contacted labor law attorney Paul Hurcomb in January 2006 for legal advice concerning compliance with the FLSA.

20.     Prior to Cindy Rucker's employment in December 2005, there was no person employed by Defendant responsible for Defendant's compliance with the Fair Labor Standards Act.

21.     After Cindy Rucker was employed by Defendant, it was part of her responsibilities to assure compliance with the Fair Labor Standards Act.

22.     After Cindy Rucker left Defendant in June 2006, Kevin Bohan in his role as finance manager and Paul Debonis, president of Defendant, became Defendant's Human Resources department and took responsibility for Defendant's compliance with the Fair Labor Standards Act.

23.     Up until approximately September 2007, Defendant paid Plaintiffs for their work in the field a day rate for every day worked in the field.

24.     If Plaintiffs worked in the shop, Defendant paid Plaintiffs an hourly rate for every hour worked in the shop.

25.     At the beginning of operations in the United States, payroll functions for Defendant were performed in Canada.

26.     Paul Debonis became president of Defendant in July 2005.

27.     Prior to Debonis becoming president there were no other executive employees of Defendant in the United States and Defendant's operations were being directed from Canada.

6

28.     Debonis's primary responsibility upon being hired was to develop new business in the United States, and he had no responsibility for the operation of Defendant's business in the United States.

29.     Defendant started hiring other employees in the United States to operate Defendant's U.S. business in December 2005 and officially opened an office in April 2006.

30.     Defendant had no employees in the United States to do payroll until Defendant hired Cindy Rucker in December 2005.

31.     Cindy Rucker was hired primarily to transition payroll from Canada and perform the payroll function in the United States for Defendant.

32.     Defendant began to transition the running of payroll for Defendant's employees to the United States in January 2006 and the transition was completed by March 2006.

33.     Field employees in Canada were paid a day rate.  There was no pay called overtime pay.

34.     Defendant had operations in Alberta, Canada.

35.     In late December 2005 or early January 2006, Rucker had a discussion with Debonis in which she questioned the day rate and whether the day rate was the correct way to pay employees for their work in the field.

36.     Rucker had never seen a day rate before, and she was concerned whether it was correct under the law.

37.     Rucker was aware that the Fair Labor Standards Act required overtime, but was not aware of the details of the law.

38.     Debonis told her to look into the day rate issue.  He told her to hire Paul Hurcomb, an experienced labor law lawyer in Colorado Springs.

39.    Rucker spoke with Hurcomb for the first time on January 4, 2006.

40.    In a January 9, 2006 email to Hurcomb, Rucker stated in part:

> We are currently paying the field (non-exempt) employees a day
> rate with the overtime rate factored into the day rate.  Do we need
> to give a breakdown of the regular rate vs. overtime rate in their
> offer letters?  The Operations Manager would like to pay the field
> employees a salary and a bonus per job they complete.  I thought
> we might be able to do that but my research looks like that's not
> possible since they don't fit into any of the five categories that can
> be salaried and non-exempt.
>
> My main question to resolve to day are whether we are paying the
> non-exempt employees correctly with the day rate (I want to make
> sure if we ever get audited that we can prove that we've paid
> correctly) and if the offer letter(s) need to be revised.  For example,
> I'm uncomfortable with the language regarding probationary
> period but have been advised that the medical/dental insurance is
> available to certain employees after they have met the
> probationary.
>
> I'll call you at 2:00.

41.    Rucker understood that field employees were non-exempt and that non-exempt meant they were entitled to be paid overtime.

42.    Rucker in her previous jobs had dealt with overtime questions and although unsure, she generally thought that the overtime threshold might be 40 hours in a workweek.

43.    Rucker and Hurcomb had several conversations in January 2006.  Rucker sent Hurcomb copies of the offer letter Defendant was using at the time.

44.    In their conversations, Rucker asked Hurcomb questions about the manner and method of paying field employees and questions about the offer letter Defendant was using.

45.    Rucker told Hurcomb that its employees were paid a day rate and that they worked 12-hour shifts, seven days a week.

46.    Rucker asked Hurcomb if he had dealt with day rates before and Hurcomb asked her to describe the day rate for him.

47.     Rucker told Hurcomb that she wanted to make sure the company was complying with the Fair Labor Standards Act.

48.     Hurcomb thought that Rucker was familiar with the concept of overtime being required for hours worked over 40 in a workweek.

49.     Rucker told Hurcomb that it appeared the day rate had overtime factored into it.

50.     Rucker had been told that overtime was factored into the day rate by Robin Freeman, a clerical employee who worked in Defendant's office in Evanston, Wyoming.

51.     Rucker told Hurcomb that Rucker thought but was not sure that the day rate was an idea that perhaps came from Canada, since Defendant was a subsidiary of the Canadian parent company.

52.     Hurcomb had never heard of a day rate before and was unaware of what it meant.

53.     Hurcomb's training in the FLSA prior to January 2006 consisted of attending CLEs that discussed the Fair Labor Standards Act.  He was very familiar with the issue of exempt versus non-exempt classification of employees and the basic minimum wage provision and the basic overtime provisions in the FLSA.

54.     Although he was unfamiliar with a day rate and had never heard of it before, Hurcomb believed that legal research was not necessary based on his knowledge of the FLSA.

55.     Hurcomb does not recall discussing with Rucker whether the company paid overtime for all hours over 40 prior to their conversations.

56.     Hurcomb had no legal authority to support the conclusion that including overtime in a day rate was in compliance with the FLSA.

57.     Hurcomb discussed with Rucker whether an employee who worked seven 12-hour shifts and was paid a day rate was in compliance with the FLSA.

58.   Hurcomb did not discuss with Rucker how to calculate overtime for an employee who worked seven 12-hour shifts and was paid a day rate.

59.   Rucker did not tell Hurcomb that sometimes employees worked in the shop and were paid by the hour and Hurcomb did not ask about additional compensation as overtime compensation other than the day rate.

60.   Hurcomb later learned when reviewing a proposed offer letter and from conversations with someone from Defendant that field employees might sometimes work in the shop for an hourly rate.

61.   Hurcomb and Rucker did not discuss whether the day rate properly compensated an employee for overtime when the employee worked both days in the field and hours in the shop in the same workweek or how to calculate the overtime rate for an employee who in the same workweek works in the field and also works in the shop.

62.   Hurcomb and Rucker did not discuss record keeping.

63.   Hurcomb did not advise Rucker in their conversation in January 2006 that the FLSA required the employer to keep accurate records of hours worked.

64.   Hurcomb believes that he discussed with Rucker how to pay employees if they worked over 12 hours in a day, but he believes that was under Colorado law, not the FLSA.

65.   After their conversations about the day rate, on January 9, 2006, Rucker sent an email to Tyler Bittner, Brooke McElley, Paul Debonis and Robin Freemen of Pure Energy, that stated:

> I have confirmed with an employment law attorney that we are paying our non-exempt (field) employees correctly using the day rate as long as we document that the day includes a regular rate for 8 hours and an overtime rate for the additional time (and as long as we don't exceed 12-hour shifts).  I will make sure that all offer letters going forward have language that makes this clear….

66.     Rucker was not aware of any communication from management to the field or field supervisors that employees not exceed 12-hour shifts.

67.     Rucker did not ask Hurcomb for an opinion letter nor did she specifically ask that the advice be reduced to writing with respect to the adequacy of a day rate under the Fair Labor Standards Act.

68.     Hurcomb advised Rucker that offer letters to employees compensated by a day rate should explain how the day rate was calculated.

69.     Hurcomb thought that the offer letter should explain how the day rate was calculated to avoid disputes over rates of pay and overtime.

70.     The offer letters Hurcomb was asked to review by Rucker made no mention of overtime on a weekly basis.

71.     In reviewing the offer letters, Hurcomb saw no need to include language about any weekly overtime standard.

72.     In January 2006, Debonis believes he may have been told by either Rucker or Hurcomb that the method Pure Energy was using "had to be rectified to reflect hours, not days." The day rate calculation had to show the overtime component.

73.     Debonis recalls having a discussion with Rucker after she spoke with Hurcomb about "changing the offer letters and changing the way we would pay our employees."

74.     After the Hurcomb consultation, Defendant made no change in its time sheets and did not require employees to keep track of all hours worked, including extra hours in the field, at meetings, or driving vehicles as Hurcomb did not advise any change.  Defendant continued its previous practice, implemented from the start of operations in October 2004, of having

employees indicate shifts worked in the field and hours worked in the shop, absent any contrary instruction from Hurcomb.

75.     Prior to Cindy Rucker working with Paul Hurcomb in January and February 2006 to standardize the terms of Defendant's employment agreements, Defendant used a number of different offer letters whose terms varied with respect to the description of the computation of the day rate paid Defendant's field employees.

76.     The offer letters used by Defendant prior to February 2006 were drafted out of Defendant's Canada Human Resources Department.

77.     After Rucker consulted with Hurcomb in January 2006, and before the commencement of *Condos v. Pure Energy Services*, 07-127J (D. Wyo.), and in reliance on the advice of Hurcomb, Defendant did not undertake any other review of the compliance of its practices with the overtime requirements of the Fair Labor Standards Act.

78.     From commencement of operations in the United States until approximately September 2007, Defendant required Plaintiffs to fill in a "time sheet" covering the days worked within the pay period covered by the time sheet.

79.     Before September 2007, Defendant did require employees to record the actual number of hours worked in the shop each day, but did not require employees to record the actual number of hours worked in the field.

80.     Starting in approximately September 2007, Defendant required employees to record on a time sheet the actual number of hours the employee worked each day and each week.

81.     The day rate for each Plaintiff for each pay period, including retroactive increases in the day rate, is reflected in the earnings statements supplied in discovery by Defendant to Plaintiffs in *Condos v. Pure Energy Services* and this case.

82.     When Kelly Ciprick was production testing manager, hours worked in the shop in Evanston were required to be authorized by him and the shop manager.

83.     Before Cindy Rucker consulted with Paul Hurcomb in January 2006, Defendant did not pay its employees overtime under the Fair Labor Standards Act for all hours worked over 40 in a workweek.

84.     After Cindy Rucker consulted with Paul Hurcomb in January 2006, and in reliance on the legal opinion of Hurcomb, Defendant did not pay its employees overtime under the Fair Labor Standards Act for all hours worked over 40 in a workweek until approximately September or October 2007.

85.     Before Cindy Rucker consulted with Paul Hurcomb in January 2006, if Plaintiffs worked a workweek only in the field and did not work in the shop, Plaintiffs were paid only their day rate regardless of how many hours were worked in the workweek.

86.     After Cindy Rucker consulted with Paul Hurcomb in January 2006, Defendant, in reliance on the legal opinion, paid Plaintiffs who worked a workweek only in the field and did not work in the shop their day rate regardless of how many hours were worked in the workweek.

87.     Before Cindy Rucker consulted with Paul Hurcomb in January 2006, if Plaintiffs worked over 40 hours in the shop in a workweek, Defendant often paid Plaintiffs only straight time for all hours worked in the shop.

88.     After Cindy Rucker consulted with Paul Hurcomb in January 2006, if Plaintiffs worked over 40 hours in a shop in a workweek, sometimes Defendant paid Plaintiffs for all hours worked over 40 at time and one half the hourly shop rate, and sometimes Defendant paid the Plaintiffs time and one-half the hourly shop rate only for hours worked over eight in a day.

89.     Before Cindy Rucker consulted with Paul Hurcomb in January 2006, if Plaintiffs worked both days in the field and hours in the shop the same workweek, Defendant did not combine the hours worked in the field and hours worked in the shop to determine whether Plaintiffs were owed overtime under the Fair Labor Standards Act and did not pay Plaintiffs at time and one half the overtime rate as calculated under the Fair Labor Standards Act for all hours worked over 40 in the workweek.

90.     After Cindy Rucker consulted with Paul Hurcomb in January 2006, and in reliance on his legal opinion, if Plaintiffs worked both days in the field and hours in the shop in the same workweek, Defendant did not combine the hours worked in the field and hours worked in the shop to determine whether Plaintiffs were owed overtime under the Fair Labor Standards Act and did not pay Plaintiffs at time and one-half the overtime rate as calculated under the Fair Labor Standards Act for all hours worked over 40 in the workweek.

91.     Before the time Defendant started requiring employees to record the actual number of hours worked each day and each week, if Plaintiffs only worked days in the field in a workweek, Defendant never paid any additional compensation for hours worked in the field other than the day rate, regardless of how many days were worked in the field or hours were worked in the workweek.

92.     Before the time Defendant started requiring employees to record the actual number of hours worked each day and each week, if an employee worked both days in the field and hours in the shop in the same workweek, Defendant never paid any additional compensation for hours worked in the field other than the day rate, regardless of how many hours were worked in the field, or days were worked in the field, or hours were worked in the workweek.

93.     Kelly Ciprick started working for Defendant in October 2004, when Defendant started operations in the United States, as field supervisor.

94.     Ciprick used his vehicle to transport crew to the location where they were working; crews ranged from one to two operators.

95.     Ciprick became a field superintendent in January 2005, helped the testing manager organized crews, did field visits.

96.     In October 2005, Ciprick became production testing manager.

97.     Ciprick's job remained the same from October 2004 to January 2005 as field supervisor.

98.     Ciprick worked both day and night shifts.

99.     Ciprick left the hotel anywhere from 6:00 to 6:30 and arrived at the work site by approximately 6:30 to 20 minutes to 7:00.

100.    Once at the site he reviewed the shift change safety meeting with the outgoing crew supervisor.

101.    Ciprick would leave the work site at the end of the shift at approximately 7:10 to 7:15.

102.    Ciprick periodically worked past 7:10 or 7:15, maybe once a month, approximately one hour to help out the other shift, usually during rigging out rigging in.

103.    Ciprick does not know what other field supervisors did as far as staying after shift in this time period.

104.    After Ciprick became field superintendent in January 2005, he was familiar with the job being done by field supervisors and crews in the field.  There was more equipment in the

field meaning more responsibility, but the basic structure of the day, picking up crew, driving to location, working on location, remained the same in this period.

105.    As production testing manager, Ciprick organized crews, dealt with clients, hired crew members, did field inspections, and managed all the supervisors under him.

106.    When he was production testing manager, he knew that employees sometimes worked beyond their 12-hour shift; usually it was to rig out or rig in.

107.    At various times, field employees were required to attend work meetings before or after their shifts.

108.    Kelly Ciprick started calling those meetings when he became production testing manager in October 2005.

109.    The meetings were held at the hotel in Pinedale for those in Wyoming.

110.    Meetings were mandatory.

111.    Meetings discussed safety issues, company growth and any concerns of the employees.

112.    According to Ciprick, the meetings lasted about an hour.

113.    According to Ciprick he tried to hold meetings once a month, or sometimes once every two months.

114.    Plaintiffs who were field supervisors were either given a truck by Defendant to be used for work or agreed to use their own truck for work.

115.    Plaintiffs who were supervisors were required to drive the vehicles to the work site they were assigned to each day.

116.    Plaintiffs who agreed to use their own truck for work were compensated by a truck rate for each day the truck was used.

117.    Field supervisors were required to use their company truck to transport crew members each day to the location where they were working that day.

118.    The crew ranged from one to three persons.

119.    Crew members were required to ride from point of origin, whether the hotel where the crew member was staying or the crew member's home, to the work location in the field.

120.    Normally, only if a truck was out of service for repairs would crew members be allowed to drive their own vehicles to the work site.

121.    Supervisors were required to use their trucks occasionally to transport diesel fuel, fittings, valves, pipe, shacks and stacks, and tools, all of which were used during the shift to do the work out in the field.

122.    The trucks were equipped with an external fuel tank that was used on occasion to supply fuel to the generator at the work site and other work site equipment requiring fuel including a pipe skid.

123.    The truck was sometimes used during the paid shift time to transport items and to retrieve parts and fittings from other locations close by.

124.    The truck was sometimes used during the paid shift time to transport the crew to a different location.

125.    During the paid time shift the truck was available to use as the emergency vehicle, in case of the need to transport an injured worker in an emergency.

126.    Driving the truck to location was part of the shift for a supervisor.

127.    Defendant had no records of the actual time spent by Plaintiffs who drove vehicles provided by Defendant or Plaintiffs' personal vehicles on work for Defendant.

128.    Defendant has no knowledge of the actual time it took Plaintiffs to drive to the work sites.

129.    The amount of time it took to drive to a work location varied depending on the location.

130.    Defendant has never required employees driving company vehicles to and from work sites to record actual hours worked including driving time.

131.    In September 2007, Defendant changed its compensation of field employees from a day rate to an hourly pay system.  After instituting the hourly pay system, Defendant started paying overtime at time and one-half the hourly rate for all hours worked over 40 in a workweek but not including time spent driving.

132.    Defendant has never required its supervisor employees to record the actual time spent driving trucks to and from the well sites.

133.    Defendant has never counted as hours worked time spent by supervisor employees driving trucks to and from the well sites.

134.    Defendant has never compensated as overtime hours, hours spent by supervisor employees driving trucks to and from the well sites regardless of the number of hours worked in the workweek.

**VI.    Witnesses**

Defendant MAY call as witnesses to testify at trial:

1.    Paul Hurcomb; 24 S. Weber Street, Ste. 400, Colorado Springs, CO; Mr. Hurcomb will testify as to the documents he received from Ms. Rucker, his review of those documents and the legal advice he provided to Ms. Rucker regarding the pay practices of Defendant.

2.      Cindy Rucker; 752 Bristle Pine Circle, Unit B, Highlands Ranch, CO; Ms. Rucker will testify as to the method of payment of field service employees; the legal advice she received from Paul Hurcomb and her compliance with and good faith reliance on the legal advice she received.

3.      Kelly Ciprick; Pure Energy Services, Evanston, WY; Mr. Ciprick will testify as to the hours worked by field service employees and specifically the Plaintiffs, he will testify as to mandatory meetings of employees and his recollection of the dates, duration and frequency of such meetings, and he will testify as to the transportation of employees to and from the work sites and the materials transported on the trucks, if any.

4.      All Plaintiffs; addresses unknown; Plaintiffs will be called as adverse witnesses to testify as to the terms of their coming to work for Pure Energy, the hours they claim to have worked, their attendance at meetings including the dates, duration and frequency of any meetings, the transportation provided by Defendant without charge to and from the job site, the duration of the travel to and from the job site, the type of vehicle used and any equipment transported to the job site.

5.      Any witness needed for rebuttal

6.      Any witnesses needed for impeachment

**VII.    Exhibits**

A.      Job description for Production Testing Supervisor – *Condos* deposition Ex. 1

B.      Job description for Production Testing Operator – *Condos* deposition Ex. 2

C1 - C-19.      Paul Hurcomb e-mails – *Condos* deposition Ex. 16

D-1 - D-55.      Paul Hurcomb documents – *Condos* deposition Ex. 27

19

E 1- E-?.        Payroll records for all Plaintiffs – (previously provided to Plaintiffs'

counsel).

F-__.    Any document needed for impeachment or rebuttal.

**VIII.   Amendments to the Pleadings**

None anticipated

**IX.    Trial Briefs**

Trial Briefs may be necessary.

**X.       Settlement Possibilities**

Settlement possibilities are remote.  However, if the parties can reach agreement on the

amount of damages based on the Court's rulings, that would leave only the issues of liquidated

damages and attorney fees.  Defendant has no evidence to offer with respect to liquidated

damages, other than what was contained in its Motion for Partial Summary Judgment.  Thus,

agreement can be reached on damages, no trial would be necessary.

Dated this  4th day of December, 2009.


                                                    s/  W.V. Bernie Siebert
                                                    _____
                                                    W.V. Bernie Siebert
                                                    SHERMAN & HOWARD L.L.C.
                                                    633 Seventeenth Street, Suite 3000
                                                    Denver, CO  80202
                                                    (303) 299-8222
                                                    (303) 298-0940 (fax)
                                                    bsiebert@sah.com

Sharon M. Rose
Lavery & Rose, P.C.
P.O. Box 890
Evanston, WY  82930
(307) 444-4200
(307) 444-0559 (fax)
srose@evanstonlaw.com

*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on December 4, 2009 the foregoing Defendant's Pre-Trial Memorandum was filed electronically using the Court's ECF system which system will automatically serve the following individuals by email:

Jason M. Tangeman – jtangeman@wyolegal.com
ANTHONY, NICHOLAS & TANGEMAN, LLC
170 North Fifth Street
P.O. Box 928
Laramie, WY  82072

Alan S. Kaufman – ask@flsa.com
CHAMBERLAIN, KAUFMAN & JONES
35 Fuller Road
Albany, NY  12205

And a copy was sent via email directly to:

The Chambers of Judge Johnson
WYOJUDGEAB@WYD.USCOURTS.GOV

s/ Clarine Kuntz